# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

NATIONAL FEDERATION       *
OF THE BLIND, INC., *et al.*,

      *

        Plaintiffs,

      *

v.                          Civil Action No. 1:14-cv-01631-RDB

      *

LINDA H. LAMONE, *et al.*,

      *

        Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Daniel F. Goldstein
Jessica P. Weber
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
dfg@browngold.com
jweber@browngold.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF FACTS ................................................................................................... 2

    I.      Background on absentee voting in Maryland ........................................................ 2

    II.     The online ballot marker tool.............................................................................. 3

    III.    The Board fails to make the online ballot marker tool available ........................... 5

    IV.    The NFB and the individual plaintiffs and their disabilities, use of assistive
            technology, and plans for voting....................................................................... 7

LEGAL STANDARD......................................................................................................... 11

ARGUMENT .................................................................................................................... 11

    I.      Plaintiffs are likely to succeed on the merits of their ADA and Section 504
            claims. ........................................................................................................... 11

    II.     Plaintiffs are likely to suffer irreparable harm in the absence of preliminary
            relief. ............................................................................................................ 21

    III.    The balance of equities tips decidedly in Plaintiffs' favor. .................................. 22

    IV.    An injunction is in the public interest. ................................................................ 22

    V.     Plaintiffs are prepared to post a bond. ............................................................... 23

CONCLUSION................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Am. Council of the Blind v. Paulson,*
    463 F. Supp. 2d 51 (D.D.C. 2006),
    *aff'd and remanded,* 525 F.3d 1256 (D.C. Cir. 2008).......................................................... 17, 18

*California Council of the Blind v. Cnty. of Alameda*,
    -- F. Supp. 2d --, No. 13-CV-03443-JCS, 2013 WL 5770560,
    (N.D. Cal. Oct. 24, 2013) .................................................................................................. 16, 18

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005).................................................................................................... 14

*Dewhurst v. Century Aluminum Co.*,
    649 F.3d 287 (4th Cir. 2011).................................................................................................... 12

*Disabled in Action v. Bd. of Elections*,
    -- F. 3d --, No. 12-4412-cv, 2014 WL 1910361 (2d Cir. May 14, 2014) .......................... 16, 18

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999).................................................................................................... 24

*Jones v. City of Monroe*,
    341 F.3d 474 (6th Cir. 2003).................................................................................................... 23

*Kerrigan v. Philadelphia Bd. of Election*,
    No. CIV. A. 07-687, 2008 WL 3562521 (E.D. Pa. Aug. 14, 2008)................................... 16, 17

*Marlo M.* ex rel. *Parris v. Cansler*,
    679 F. Supp. 2d 635 (E.D.N.C. 2010) ..................................................................................... 24

*Nat'l Org. on Disability v. Tartaglione*,
    No. Civ. A. 01-1923, 2001 WL 1231717 (E.D. Pa. Oct. 11, 2001)......................................... 16

*Pathways Psychosocial v. Town of Leonardtown*,
    223 F. Supp. 2d 699 (D. Md. 2002) ........................................................................................ 22

*Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*,
    No. CIV.A. DKC 13-1128, 2014 WL 857947 (D. Md. Mar. 4, 2014) .................................... 24

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
    584 F. Supp. 2d 766 (D. Md. 2008)
    *aff'd*, 368 F. App'x 370 (4th Cir. 2010)................................................................................... 24

*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*,
    673 F.3d 333 (4th Cir. 2012) .............................................................. 13

*Tennessee v. Lane*,
    541 U.S. 509 (2004) ..................................................................... 16, 23

*Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*,
    346 F. Supp. 2d 473 (S.D.N.Y. 2004) ........................................... 16, 17

*Winter v. Natural Res. Def.  Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................... 12

## Statutes

29 U.S.C. § 794 ................................................................................ 1, 13, 14

42 U.S.C. § 12102 ...................................................................................... 14

42 U.S.C. § 12131 ...................................................................................... 12

42 U.S.C. § 12132 ...................................................................................... 12

42 U.S.C. § 12188(a)(2) ............................................................................. 22

42 U.S.C. §§ 12101-12213 ..................................................................... 1, 23

42 U.S.C. §§ 1973ff-1973ff-6 ................................................................. 3, 22

Md. Code Ann., Elec. Law § 9-102 ......................................................... 5, 6

Md. Code Ann., Elec. Law § 9-308.1 ...................................................... 5, 6

Md. Code Ann., Elec. Law. § 9-304 ........................................................... 2

## Regulations

28 C.F.R. § 35.130(b)(1)(ii)-(iii) ............................................. 13, 14, 15, 18

28 C.F.R. § 35.160 ............................................................................... 13, 14

45 C.F.R. § 84.4(b)(1)(iii) ................................................................ 13, 14, 15

## Rules

Federal Rule of Civil Procedure 65 ........................................................... 24

## Other Authorities

97 *Op. Att'y Gen.* 32 (2012) ............................................................. passim

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| NATIONAL FEDERATION | * | |
| OF THE BLIND, INC., *et al.*, | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Civil Action No. |
| | * | |
| LINDA H. LAMONE, *et al.*, | | |
| | * | |
| Defendants. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs the National Federation of the Blind, Inc. ("NFB"), Kenneth Capone, Melissa Riccobono, and Janice Toothman (collectively "Plaintiffs") bring this Motion for Preliminary Injunction against Defendants Linda H. Lamone, in her official capacity as State Administrator of the Maryland State Board of Elections ("the Board"), Bobbie S. Mack, in his official capacity as Chairman of the Board, David J. McManus, Jr., in his official capacity as Vice Chairman of the Board, and Patrick J. Hogan, Rachel T. McGuckian, and Charles E. Thomann, in their official capacities as members of the Board, to enjoin the Board from denying individuals with disabilities an equal opportunity to cast their votes through the use of an online absentee ballot marking tool in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

Plaintiffs are likely to prevail on the merits of their claim because without access to the online absentee ballot marker tool, Mr. Capone, Ms. Riccobono, Ms. Toothman, and many NFB

members will be required to sacrifice their right to vote privately, independently, and in an equally effective manner.  Furthermore, because the Board already possesses a fully accessible online ballot marker tool and there are no risks to the security of the election results inherent in using the tool, making the ballot marker tool available to voters would not impose an undue burden on the Board or constitute a fundamental alteration of its services.  Because Plaintiffs' civil rights are at stake in this litigation, Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction.  The balance of the equities tips decidedly in Plaintiffs' favor because if the Board is not preliminarily enjoined, Mr. Capone, Ms. Riccobono, Ms. Toothman, and many NFB members will be denied the right to vote privately, independently, and in an equally effective manner in the June 24, 2014 primary elections.  Conversely, the Board will suffer no harm by making its online ballot marker tool available for absentee voters in the June election. Finally, the public interest will be served by enforcing the ADA and Section 504's goal of creating equal opportunities for individuals with disabilities to participate in civic life and exercise their fundamental right to vote.  Accordingly, this Court should issue Plaintiffs a preliminary injunction and require the Board to make the online ballot marking tool available for use in the June 24, 2014 primary elections.

## STATEMENT OF FACTS

### I.      Background on absentee voting in Maryland

Maryland has a "no-excuse" absentee ballot voting process whereby eligible voters need not provide a reason to vote by absentee ballot.  Md. Code Ann., Elec. Law. § 9-304 ("An individual may vote by absentee ballot except to the extent preempted under an applicable federal law.").  Voters can choose how they would like to receive their absentee ballots.  Decl. of Denise M. Altobelli, May 19, 2014 ("Altobelli Decl."), Ex. A (screen shot of Board website).

2

They can have the absentee ballots mailed or faxed to them or they can download the ballots from the Board's website ("electronic delivery").  *Id.*  Regardless of the delivery option, the Board requires absentee voters to mark their ballots by hand and return them to their local boards of elections by mail or hand delivery.  *Id.*, Ex. B (screen shot of Board website).  Thus, when a voter receives an absentee ballot through electronic delivery, she must print the ballot and fill out the printed paper ballot by hand.

The Board uses the Model ES-2000 optical-scan system to record and tabulate absentee votes.  Ex. 1, 97 *Op. Att'y Gen.* 32, 37 (2012).  The scanner can read ballots delivered to voters by mail or by hand, but it cannot read electronically-delivered ballots because regular printer paper is too thin and does not contain "timing marks."  *Id.* at 42.  Therefore, when local boards of elections receive electronically-delivered absentee ballots, they must assemble bipartisan duplication teams to manually copy the selections from the electronically-delivered ballots onto ballot cards capable of scanning.  *Id.*  Only then can the ballots be scanned and these absentee votes counted.  As described in a memorandum authored by Assistant Attorney General Jeffrey L. Darsie, because of this manual duplication system, the increased use of electronically-delivered absentee ballots has "increased the administrative burden on the local boards during the absentee ballot canvass."  Ex. 2 at 3, Apr. 23, 2014 Memorandum from Jeffrey L. Darsie to Members of the State Board of Elections ("Darsie Mem.").

**II.     The online ballot marker tool**

To address the burden of manually copying electronically-delivered ballots and to make absentee voting easier for uniformed military personnel and overseas civilians, voters covered under the Uniformed and Overseas Civilian Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. §§ 1973ff-1973ff-6, the Board applied for and received a grant in 2011 from the Federal

Voting Assistance Program, a unit of the United States Department of Defense, for $653,719 to develop, among other types of voting technology, an online ballot marking tool.  Ex. 1, 97 *Op. Att'y Gen.* 32, 42 (2012); Ex. 2, Darsie Mem. at 3.  In its grant application, the Board explained that an online ballot marking tool would "improve the accuracy and readability of the voter's voted ballot as it will be designed to prevent overvotes and other voter errors, decrease the likelihood that an election official has to determine the intent of the voter, and increase the voter satisfaction with the voting process."  Ex. 2, Darsie Mem. at 43.

The online ballot marking tool that the Board developed allows voters to make their voting selections on their computers, review a summary screen showing their selections, and print out the ballot with their selections marked.  Decl. of Anne Taylor, May 16, 2014, ¶ 9 ("Taylor Decl.").  The ballot marking tool notifies voters if they select too few or too many options ("undervoting" and "overvoting" respectively) and gives voters an opportunity to correct their ballots accordingly.  *Id.*  The ballot marking tool also generates a barcode encapsulating the voter's sections that is printed onto the hard copy absentee ballot.  *Id.*  This barcode can then be scanned to automatically generate a duplicate ballot that is readable by the ES-2000 optical-scan system. Ex. 1, 97 *Op. Att'y Gen.* 32, 43 (2012).  In the Board's grant proposal, it explained "two significant benefits" of the online ballot marking tool's barcode feature:

> First, it serves an important safeguard during the canvassing process and improves the accuracy of the counting process by reducing the risk of transcription error when manually duplicating a ballot.  It also improves the efficiency of the canvasses conducted by local election officials by replacing a manual process with a primarily automated process with a manual verification.

Ex. 1 at 43.

From the fall of 2013 through the winter of 2014, NFB staff members worked with the Board's employees to correct problems with the online ballot marker tool to ensure its

4

accessibility for the blind and others with print disabilities who use assistive technology to access content visually displayed on their computers.  Taylor Decl. ¶¶ 6-7.  Anne Taylor, Director of Access Technology, and Lou Ann Blake, Director of Outreach, devoted significant time testing the online ballot marker tool technology and communicating with Board employees, specifically Chere' Evans, to fix problems.  *Id.*; Decl. of Dr. Marc Maurer, May 19, 2014, ¶ 5 ("Maurer Decl.").  Thanks to this collaboration, the Board now has a fully accessible online ballot marker tool.  Taylor Decl. ¶ 8.

**III.     The Board fails to make the online ballot marker tool available**

In August 2012, the Maryland Attorney General's Office issued an opinion letter responding to Maryland State Senator Edward J. Kasemeyer's question regarding whether the Board could implement the online ballot marking tool without first certifying it pursuant to Md. Code Ann., Elec. Law § 9-102, which requires certification of "voting systems."  Ex. 1 at 1.  The Attorney General opined that because the ballot marking tool does not meet the definition of a "voting system," nor does it modify a voting system, the Board need not certify it under § 9-102 prior to making it available to absentee voters.  During the 2012 general election, the Board offered the online ballot marking tool only to absentee voters covered under UOCAVA.  Ex. 2, Darsie Mem. at 4.

During the 2013 legislative session, the Maryland legislature passed Senate Bill 279, which required the Board to certify the online ballot marking tool before making it available to absentee voters.  Ex. 2 at 4; Md. Code Ann., Elec. Law § 9-308.1.  Under the new law, the Board must certify that the online ballot marking tool will: (1) "protect the secrecy of the ballot"; (2) "protect the security of the voting process"; (3) "accommodate any ballot used" in Maryland's election law statutes; (4) "protect all other rights of voters and candidates"; (5) "be capable of

creating a paper record of all votes cast in order that an audit trail is available in the event of a recount, including a manual recount"; (6) "provide a voter-verifiable paper record"; and (7) serve "the public interest."  §§ 9-308.1, 9-102(d).

The Board was scheduled to vote on certifying the online ballot marker tool at its April 24, 2014 meeting.  Altobelli Decl., Ex. C (Apr. 24, 2014 Agenda).  In advance of the vote, the Board engaged Unatek, Inc., a security consultant, to perform a security review and assessment of its "Online Voter Services."  *Id*., Ex. F.  Unatek concluded that "the Online Voter Services and the underlying network system infrastructure are resilient and that reasonable security controls have been put in place."  *Id.* at 1.  Mainstay Enterprises, Inc., which the Board hired to audit Unatek's work, concluded that Unatek's security review and assessment "were reasonable and consistent with best practices and industry standards for conducting a security review of the Voter Services Application."  *Id.*, Ex. G at 1.

In advance of the April 2014 meeting, various interested parties submitted letters for and against certification.  Plaintiff Melissa Riccobono, on behalf of the NFB of Maryland, submitted a letter explaining that the online ballot marking tool is now accessible and would allow blind and other print-disabled voters to cast their absentee votes privately and independently.  Altobelli Decl., Ex. D.  The Maryland Disability Law Center also submitted a letter explaining that the ADA and Section 504 required the Board to make the online ballot marking tool available to afford blind and other print-disabled individuals an equal opportunity to vote.  Altobelli Decl., Ex. E.

The Board did not vote to certify the online ballot marker tool at its April meeting. Taylor Decl. ¶ 10.  Although it continues to offer electronic delivery of absentee ballots, the

Board is not currently offering use of the online ballot marker tool for the June 24 primary elections.  Altobelli Decl., Ex. A & B (screen shots of Board website)

    **IV.**    **The NFB and the individual plaintiffs and their disabilities, use of assistive technology, and plans for voting**

The National Federation of the Blind is the oldest and largest national organization of blind persons.  Maurer Decl. ¶ 4.  It has affiliates in all 50 states, Washington, D.C., and Puerto Rico, and its headquarters are located in Baltimore, Maryland.  *Id.*  The NFB and its affiliates are widely recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families.  *Id.*  The organization promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, employment, family and community life, transportation, and recreation.  *Id.*

The ultimate purpose of the NFB is the complete integration of the blind into society on a basis of equality.  *Id.* ¶ 5.  This objective includes the removal of legal, economic and social discrimination.  *Id.*  As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have an equal opportunity to cast their votes privately and independently by collaborating with developers of voting technology to ensure its accessibility for the blind.  *Id.*  The NFB has diverted its resources away from other priorities, like equal access to education and employment, to assist with making voting technology accessible.  *Id.*

The NFB is a membership organization and has many members who are registered to vote in Maryland and wish to exercise their right to vote through the use of absentee ballots.  Maurer Decl. ¶ 6.  Plaintiffs Melissa Riccobono and Janice Toothman, described below, are

members of the NFB.  Decl. of Melissa Riccobono, May 18, 2014, ¶ 3 ("Riccobono Decl.");

Decl. of Janice Toothman, May 16, 2014, ¶ 6 ("Toothman Decl.").

Kenneth Capone is a resident of Elkridge, Maryland who is registered to vote in

Maryland as a Republican.  Decl. of Kenneth Capone, May 19, 2014, ¶¶ 2, 4 ("Capone Decl.").

He is the Public Policy Coordinator for People on the Go, a self-advocacy organization for

individuals with intellectual and developmental disabilities.  *Id.* ¶ 3.  Mr. Capone was recently

appointed to serve on the President's Committee for People with Intellectual Disabilities.  *Id.*

Mr. Capone has cerebral palsy and cannot use his arms or legs, nor can he use his voice to speak.

*Id.* ¶ 5.  He uses a wheelchair to ambulate.  *Id.*  To interact with computers and tablet devices

without the use of his hands, Mr. Capone wears a head stick that allows him to type and navigate

when the computer or tablet is placed on a high table.  *Id.* ¶ 6.

Mr. Capone plans to vote in the June 24, 2014 Republican primary elections.  *Id.* ¶ 7.  He

would prefer to vote with an absentee ballot for two reasons.  *Id.* ¶ 8.  First, because he has tested

the voting machines in polling places, he knows that he cannot vote privately and independently

at a polling location.  *Id.*  Were Mr. Capone to vote in person, he would require assistance to

operate the voting machine to cast his vote.  *Id.*  Second, voting absentee is much easier for Mr.

Capone because it does not require him to arrange transportation to a polling location.  *Id.*

It is important to Mr. Capone to be able to cast his vote privately and independently.  *Id.*

¶ 9.  To do so, he needs to be able to fill out his absentee ballot on his computer or tablet device.

*Id.*  Because he cannot use his hands to write, if Mr. Capone were required to fill out a paper

ballot, he would need someone to assist him and cast his vote for him.  *Id.*  However, through the

use of his head stick, he would be able to use the online ballot marker tool to record his vote

privately and independently.  *Id.*

Melissa Riccobono is a resident of Baltimore, Maryland who is registered to vote in Maryland as a Democrat.  Riccobono Decl. ¶¶ 2, 4.  She serves as the President of the National Federation of the Blind of Maryland.  *Id.* ¶ 3.  Ms. Riccobono is blind and uses screen access software to access text on her computer and smartphone.  *Id.* ¶ 5.  Screen access or screen reader software transmits textual information on a computer screen into an audio output or a refreshable Braille display pad.  Taylor Decl. ¶ 5.  On her home computer, Ms. Riccobono uses the screen access software Job Access with Speech ("JAWS") and on her iPhone, she uses VoiceOver, Apple's built-in screen access software.  Riccobono Decl. ¶ 5.  Ms. Riccobono sometimes accesses text by listening to the screen reader's audio output, but her preferred method of reading is Braille.  To access text with Braille, Ms. Riccobono connects her refreshable Braille display to her computer or iPhone.  *Id.*

Ms. Riccobono plans to vote in the June 24, 2014 Democratic primary elections and has already requested an absentee ballot.  *Id.* ¶¶ 6-7.  Ms. Riccobono prefers to vote absentee because she has found the poll workers to be poorly trained on how to operate the voting machines so that their accessibility features are enabled.  *Id.* ¶ 7.  Consequently, voting in person can take a very long time.  *Id.*  In addition, as the mother of three children, it is more convenient for her to vote on her own schedule, without having to take her children with her to the poll or arrange for child care.  *Id.*

Ms. Riccobono wants to be able to cast her absentee vote privately and independently, but cannot do so if she must fill out a paper absentee ballot by hand.  *Id.* ¶¶ 8-9.  Because she is blind, she requires sighted assistance to mark her selections on a paper ballot.  *Id.* ¶ 8.  If Ms. Riccobono had access to the online ballot marker tool, she could fill out her ballot privately and independently by connecting her refreshable Braille display to her computer or iPhone to read

the text of the ballot and using the keyboard to make her selections.  *Id.* ¶ 9.  The online ballot

marker tool would also allow Ms. Riccobono to use Braille, her preferred method of reading, to

review the ballot.  *Id.* ¶ 7.  Because ballot questions are often long and complicated, Ms.

Riccobono would strongly prefer being able to read the ballot in Braille as she makes her

selections.  *Id.*  This is not an option for her at the polling sites, where the voting machines only

allow for audio output, not connection to a Braille display.  *Id.*

Janice Toothman is a resident of Bowie, Maryland and is registered to vote in Maryland

as a Democrat.  Toothman Decl. ¶¶ 2, 4.  Ms. Toothman is a student at Towson University.  *Id.* ¶

3.  She is deaf-blind and uses JAWS to access text on her computer screen.  *Id.* ¶¶ 5-6.  She has

some limited hearing and use hearings aids and an FM system to hear close proximity

conversations.  *Id.* ¶ 5.  She can hear conversations that are three to five feet away from her

provided that the speaker has a loud and clear voice and the surrounding environment is

relatively free of background noise.  *Id.*  The more background noise there is, the less she can

hear, no matter how close the speaker.  *Id.*  Ms. Toothman's hearing often causes her to confuse

letters or words, even with her hearing aids.  *Id.*  As a result, when Ms. Toothman has to rely on

her hearing, she often must guess at what she has heard, which is tiring and stressful for her.  *Id.*

Ms. Toothman plans to vote in the June 24, 2014 Democratic primary elections and

would prefer to vote absentee.  *Id.* ¶¶ 8-9.  Like Ms. Riccobono, Ms. Toothman has encountered

great difficulty at polling locations, where poll workers frequently do not know how to operate

the voting machines for nonvisual access and are unable to assist when problems arise.  *Id.* ¶ 9.

Even when the voting machines work properly, it is nearly impossible for Ms. Toothman to cast

her vote in person because she cannot hear the voting machine's audio output clearly,

particularly given the background noise at the polling location.  *Id.* The voting machines do not

10

allow Ms. Toothman to connect her refreshable Braille display to cast her vote without audio or visual access.  *Id.*

Ms. Toothman would like to cast her absentee vote privately and independently, which she cannot do if she has to mark a paper ballot by hand with sighted assistance.  *Id.* ¶¶ 10-11. With the online ballot marker tool, however, Ms. Toothman could use JAWS, her refreshable Braille display, and her keyboard to read, navigate, and fill out the ballot, enabling her to cast her vote without assistance.

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if they can demonstrate: (1) "that [they are] likely to succeed on the merits"; (2) "that [they are] likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in [their] favor"; and (4) "that an injunction is in the public interest."  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Res. Def.  Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### I.      Plaintiffs are likely to succeed on the merits of their ADA and Section 504 claims.

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Public entities include "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131 (1)(B).  In providing aids, benefits, or services, public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may public entities provide qualified

individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others.  28 C.F.R. § 35.130(b)(1)(ii)-(iii).  Public entities are also required to provide "appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).   The aids and services must be provided to "protect the privacy and independence of the individual with a disability."  § 35.160(b)(2).

Similarly, under Section 504 of the Rehabilitation Act of 1973, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Moreover, a recipient of federal financial assistance may not, in providing aids, benefits, or services, "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may such programs and activities provide qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others."  45 C.F.R. § 84.4(b)(1)(ii)-(iii).  Therefore, the Board is obligated to provide Mr. Capone, Ms. Riccobono, Ms. Toothman, and members of the NFB with an opportunity to participate in and benefit from its voting program that is equal to and as effective as the non-disabled individuals' opportunity to cast their votes.

To prove a violation of either the ADA or Section 504,[1] Mr. Capone, Ms. Riccobono, Ms. Toothman, and NFB members must establish that: (1) they have disabilities; (2) they are

---

[1] Because the language of Title II of the ADA and Section 504 is substantially similar, the Fourth Circuit analyzes the two statutes together.  *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336, n.1 (4th Cir. 2012).

"otherwise qualified to receive the benefits of a public service, program, or activity"; and (3) they were "excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [their] disability[ies]." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). In addition, to prove a violation of Section 504, Plaintiffs must show that the Board receives federal funds. *See* 29 U.S.C. § 794(a).

The Board plainly receives federal financial assistance because the online ballot marker tool was developed with the assistance of a federal grant. Ex. 1, 97 *Op. Att'y Gen.* 32, 42 (2012) (describing the $653,719 grant awarded by the Federal Voting Assistance Program, a unit of the United States Department of Defense). As for proving a violation of the ADA and Section 504, the first and second prongs of this test are easily met. Because they are blind, deaf-blind, or have cerebral palsy, Mr. Capone, Ms. Riccobono, Ms. Toothman, and blind NFB members each have a physical impairment "that substantially limits one or more major life activities" such as seeing, hearing, walking, speaking, and/or performing manual tasks. 42 U.S.C. § 12102. Therefore, they each have a "disability" under the ADA. Furthermore, because Mr. Capone, Ms. Riccobono, Ms. Toothman, and many NFB members are registered to vote in Maryland as either Republicans or Democrats, they are eligible and thus "qualified" to receive the benefits of voting by absentee ballot in the June 24, 2014 primary elections,

Plaintiffs satisfy the third element of this test as well. Mr. Capone, Ms. Riccobono, Ms. Toothman, and many NFB members have been denied the right to vote in a manner that is "equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii); 45 C.F.R. § 84.4(b)(1)(ii). The methods the Board has provided for them to vote are "not as effective in affording equal

opportunity" and do not "protect the privacy and independence of the individual with a disability."  28 C.F.R. § 35.130(b)(1)(iii), § 35.160(b)(2); *see* 45 C.F.R. § 84.4(b)(1)(iii).

Because Mr. Capone cannot use his hands to cast his vote on a voting machine or on a paper absentee ballot and cannot use his head stick to navigate the voting machine, the Board has not provided Mr. Capone with any method by which to cast his vote privately and independently, thereby denying him an equal opportunity to exercise his right to vote and to partake in the Board's voting program.  *See* Capone Decl. ¶¶ 5, 6, 8, 9.  For Ms. Riccobono and Ms. Toothman, the current methods of voting offered by the Board are not effective at affording them an equal opportunity to review and comprehend the ballot when casting their votes.  Without the ability to connect their refreshable Braille displays to the voting machines, Ms. Riccobono and Ms. Toothman must rely on listening to the ballot through an audio output at the polling locations. Riccobono Decl. ¶ 7; Toothman Decl. ¶ 8.  For Ms. Toothman, who is both deaf and blind, relying on her impaired hearing to access the ballot is simply not effective, particularly given the background noise prevalent at polling locations.  Toothman Decl. ¶ 8.  The Board forces Ms. Toothman to choose between using her heavily impaired hearing to cast her vote or sacrificing her privacy and independence by relying on a third party's assistance to cast her vote for her. For Ms. Riccobono, although she can hear audio output, she finds it much more effective to read the often long and complicated questions on ballots using Braille, her preferred method of reading.  Riccobono Decl. ¶¶ 5, 7.  In addition, because poll workers are often not familiar with how to operate the voting machine's accessibility functions, Ms. Riccobono and Ms. Toothman frequently encounter long delays when trying to vote at polling locations.  Riccobono Decl. ¶ 7; Toothman Decl. ¶ 8.  These delays also impede their ability to vote in a manner that is "equal to that afforded others."  28 C.F.R. § 35.130(b)(1)(ii); 45 C.F.R. § 84.4(b)(1)(ii).

Various courts throughout the country have held that voting constitutes a program or activity under Title II of the ADA and Section 504 and, therefore, boards of elections cannot deny individuals with disabilities an equal opportunity to vote privately and independently. *See Disabled in Action v. Bd. of Elections*, -- F. 3d --, No. 12-4412-cv, 2014 WL 1910361, at *8 (2d Cir. May 14, 2014); *California Council of the Blind v. Cnty. of Alameda*, -- F. Supp. 2d --, No. 13-CV-03443-JCS, 2013 WL 5770560, at *8 (N.D. Cal. Oct. 24, 2013); *Kerrigan v. Philadelphia Bd. of Election*, No. CIV. A. 07-687, 2008 WL 3562521, at *18 (E.D. Pa. Aug. 14, 2008); *Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004); *Nat'l Org. on Disability v. Tartaglione*, No. Civ. A. 01-1923, 2001 WL 1231717, at *3-4 (E.D. Pa. Oct. 11, 2001).

These cases make clear that having a highly limited ability to cast a vote does not preclude a claim under the ADA or Section 504 for denial of an equal opportunity to cast one's vote. *Disabled in Action*, 2014 WL 1910361, at *8; *Kerrigan*, 2008 WL 3562521, at *18; *Westchester Disabled on the Move*, 346 F. Supp. 2d at 478. In *Disabled in Action*, the Second Circuit observed:

> Plaintiffs need not, however, prove that they have been disenfranchised or otherwise completely prevented from enjoying a service, program, or activity to establish discrimination under Section 504 or Title II. Rather, plaintiffs must show that BOE [Board of Elections] has failed to provide[] [them] with meaningful access to the benefit that [it] offers. . . . Here, the relevant benefit is the opportunity to fully participate in BOE's voting program. This includes the option to cast a private ballot on election days. Indeed, to assume the benefit is anything less—such as merely the opportunity to vote at some time and in some way—would render meaningless the mandate that public entities may not afford [] persons with disabilities services that are not equal to that afforded others.

*Disabled in Action*, 2014 WL 1910361, at *8 (internal quotation marks, citations, and footnote omitted). The court reasoned that in *Tennessee v. Lane*, 541 U.S. 509, 514 (2004), the Supreme Court held in favor of the disabled plaintiff under Title II of the ADA even though it was

15

possible for him to attend court proceedings by crawling up two flights of stairs or allowing court officers to carry him. *Disabled in Action*, 2014 WL 1910361, at *8, n.9 (also citing *Am. Council of the Blind v. Paulson,* 463 F. Supp. 2d 51, 59 (D.D.C. 2006), *aff'd and remanded,* 525 F.3d 1256 (D.C. Cir. 2008) ("[P]laintiffs do not need to prove 'no access' to prevail" on a Section 504 claim.)).

In *Kerrigan*, voters with mobility impairments could vote at a limited number of polling locations, but could not always cast their votes at their neighborhood polling locations. 2008 WL 3562521, at *18. The court held that even though these voters could vote in some locations, "failing to ensure that mobility disabled voters are able to vote in their neighborhood polling places, to the extent that the Defendants can do so, is a failure to provide mobility disabled voters with an equal opportunity to access the program of voting and violates the program access mandate." *Id.* Likewise, in *Westchester Disabled on the Move*, the court reasoned that providing voters with disabilities some access to voting does not satisfy the ADA and Section 504 if that access is not "meaningful." 346 F. Supp. 2d at 478. The court explained that "[f]ailing to ensure that disabled individuals are able to vote in person and at their assigned polling places— presumably the most commonly used method of voting—could not reasonably be construed as consistent with providing 'meaningful access' to the voting process, particularly where the alternatives relied upon by the Defendants impose additional costs, risks and inconveniences on disabled voters not faced by others." *Id.*

Similarly, Mr. Capone, Ms. Riccobono, and Ms. Toothman's ability cast their votes through ineffective or less effective means, or by sacrificing their privacy and independence, is legally insufficient. Instead, the ADA and Section 504 require the Board to offer Plaintiffs the opportunity to vote in a manner that is private, independent, and as effective as the methods by

which others vote.  The right to cast one's vote privately and independently is critical.  As the Second Circuit recently noted, "[t]he right to vote should not be contingent on the happenstance that others are available to help." 2014 WL 1910361, at *9; *see Am. Council of the Blind*, 525 F.3d at 1267-68 ("[T]he Rehabilitation Act's emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons.").  Furthermore, by requiring individuals with disabilities to obtain assistance to vote "at best provides these individuals with an inferior voting experience 'not equal to that afforded others' . . . [because] [b]lind and visually impaired voters are forced to reveal a political opinion that others are not required to disclose." *California Council of the Blind*, 2013 WL 5770560, at *7 (quoting 28 C.F.R. § 35.130(b)(1)(ii)).

Even if Mr. Capone, Ms. Riccobono, and Ms. Toothman could vote as effectively, privately, and independently as non-disabled voters at polling locations, the ADA and Section 504 would still require them to have equal access to absentee voting.  Absentee voting constitutes an important feature of the Board's voting program or service.  It provides individuals the opportunity to plan their votes around vacations, work schedules, and poor weather forecasts and affords voters the significant convenience of casting their votes at home.  By failing to offer blind and print-disabled voters the opportunity to vote absentee privately and independently, the Board denies these voters an equal opportunity to enjoy and participate in the process of voting.

The solution for ending the Board's discriminatory treatment of Mr. Capone, Ms. Riccobono, Ms. Toothman, and NFB members is simple: the Board must make the existing online ballot marking technology that it already possesses available to voters.  Because the Board has the technology ready to go, making the ballot marking tool available would not impose an undue burden on the Board's operations or constitute a fundamental alteration of its absentee

17

voting service.  Indeed, the Board has already made the tool available to certain voters during the 2012 elections.  Ex. 2, Darsie Mem. at 4.  There do not appear to have been any problems with use of the online ballot marker tool in 2012.

Rather than imposing an additional burden on the Board, switching from manual completion of electronically-delivered ballots to completion through the ballot marker tool would ease the administrative burden on the local boards of elections.  Ex. 1, 97 *Op. Att'y Gen.* 32, 42-43 (2012); Ex. 2, Darsie Mem. at 3.  Electronically-delivered absentee ballots that are filled in by hand require bipartisan duplication teams to manually copy the ballot onto a ballot card that can be optically scanned.  Ex. 1 at 42.  Yet a ballot completed with the online ballot marker tool does not require manual duplication.  *Id.* at 43.

The Board itself has praised the significant benefits of the online ballot marking tool in its application for federal funding to develop the tool.  Ex. 1, 97 *Op. Att'y Gen.* 32, 43 (2012).  In its grant proposal, the Board explained that the online ballot marking tool would "improve the accuracy and readability of the voter's voted ballot as it will be designed to prevent overvotes and other voter errors, decrease the likelihood that an election official has to determine the intent of the voter, and increase the voter satisfaction with the voting process."  *Id.*  With respect to the barcode generated by the ballot marker tool, the Board wrote that "it serves an important safeguard during the canvassing process and improves the accuracy of the counting process by reducing the risk of transcription error when manually duplicating a ballot" and that "[i]t also improves the efficiency of the canvasses conducted by local election officials by replacing a manual process with a primarily automated process with a manual verification."  *Id.*  Given the Board's own admissions of the vast benefits inherent in online ballot marking, it will be difficult

for the Board to abandon course and claim now that use of this tool would impose an undue burden.

Furthermore, any concerns about the security and privacy of using the online ballot marker tool are misplaced and overblown.  Use of the online ballot marking tool does not pose any risk to the security of the election results.  Taylor Decl. ¶ 11.  Although some of the letters submitted the Board in advance of its April meeting expressed concern about risks of voter fraud or the security of the election as a result of making absentee ballots available online, something that is not at issue here, no one identified the ballot marking tool as the cause of any such risks.

The criticism of the ballot marker tool focused on the hypothetical risk that a voter's privacy could be undermined by a hacker or watchful employer who could spy on the voter's electronic selections.  If the ballot marker were made available, however, voters would retain their choice of how to fill out a ballot.  Nothing would prevent the Board from advising voters of the existence of a risk of hackers viewing their selections online or, for that matter, of the risk of leaving a completed paper ballot out in plain view where others could see it.  A voter who feared casting her vote on her computer would be free to complete an electronically-delivered ballot by hand.  In short, denial of the online ballot marking tool makes certain that individuals with disabilities cannot vote privately because of a hypothetical risk that a non-disabled voter's privacy could be pierced.

Furthermore, Anne Taylor, an expert in the field of computer information systems and the NFB's Director of Access Technology, has opined that any privacy risk involved in using the ballot marker tool is remote.  Taylor Decl. ¶ 11.  Once the ballot is marked online and printed, no trace of the completed ballot is saved on the Board's server.  *Id.* ¶ 13.  Therefore, for a hacker to record a voter's ballot selections, she would need to catch the voter at the precise moment in

which he is casting his vote.  *Id.*  This makes the risk of a privacy breach significantly more remote than the risks involved where online forms are saved in the institution's servers.  *Id.*  This is the case with the online applications for Medicare and Social Security, which are saved on the government's servers and transmitted over the internet.  *Id.*  Although it is increasingly commonplace and acceptable for members of the public to share private information on these online forms, no major privacy issues have arisen as a result of people entering their data into these forms while online.  *Id.* ¶ 12.

With respect to security, not only does the online ballot marker tool not undermine the security of the election in any way, to the contrary, it enhances security by reducing the chance of voter fraud.  *Id.* ¶ 14.  Having voters fill out their ballots online is more secure than allowing them to print or download their ballots for offline completion.  *Id.*  When voters complete their ballots online, it is more likely that the same person who received a link to access the ballot from the Board's website is filling out the ballot.  *Id.*  Because printed or downloaded ballots can easily change hands, however, there is a greater risk that the person completing the ballot is different from the person who requested it.  *Id.*  Someone could print her absentee ballot with the intention of completing it later only to misplace it and have someone else cast her vote for her. *Id.*  Changing the online ballot marker tool so that ballots could be marked offline would carry similar risks—a laptop can be stolen, computers can be shared, and downloaded documents can be e-mailed to others or saved to flash drives.  *Id.*  Thus, online completion of the ballot reduces the risk of voter fraud.  *Id.*

The Board's own experts have attested to the security of the online ballot marker tool, as well as the online delivery of absentee ballots.  Unatek, Inc. conducted a vulnerability assessment and penetration testing report of the Board's entire online voter services system and

found that the "Online Voter Services and the underlying network system infrastructure are resilient and that reasonable security controls have been put in place." Altobelli Decl., Ex. F at 3. Mainstay Enterprises then audited Unatek's analysis and concluded that the security assessment was "reasonable and consistent with best practices and industry standards for conducting a security review of the Voter Services Application." *Id.*, Ex. G at 1. There is simply no concrete evidence that use of the online ballot marking tool would pose a security threat to voters or to the integrity of the election.

Because Plaintiffs meet all three elements of a claim under Title II of the ADA and Section 504 of the Rehabilitation Act, they are likely to succeed on the merits of their claims.

## II. Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.

Irreparable harm may be presumed when a defendant has violated a civil rights statute such as the ADA or Section 504. *See Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (citing *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001)). This is particularly so when that statute explicitly provides for injunctive relief, as the ADA does. *Id.* (citing *Burlington N.R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991); 42 U.S.C. § 12188(a)(2). The ADA authorizes injunctive relief, including mandatory preliminary injunctive relief, to remedy acts of discrimination against persons with disabilities. *See* 42 U.S.C. § 12188(a)(2) ("Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.").

If the Court does not grant a preliminary injunction and the Board is not required to make the online ballot marker tool available for the June primary elections, Mr. Capone will not be able to cast his vote privately and independently and Ms. Riccobono and Ms. Toothman will

have to choose between sacrificing their privacy and independence and voting through a method that is not as effective for them.  No amount of monetary relief can compensate for not being able to cast one's vote effectively, privately, and independently.

### III.    The balance of equities tips decidedly in Plaintiffs' favor.

The balance of equities tilts heavily in favor of Plaintiffs in this case.  Without access to the online ballot marker tool, Mr. Capone. Ms. Riccobono, Ms. Toothman, and many members of the NFB will not be able to cast their votes privately, independently, and effectively in the June primary elections.  Accordingly, they will suffer the effects of discrimination and exclusion from one of the most important acts a citizen in a democracy can undertake.

In contrast, the Board will suffer no harm if a preliminary injunction is granted.  The Board possesses the accessible online ballot marker tool and has already made the tool available in a previous election.  As the Board explained in its grant proposal seeking funding to develop the ballot marker tool, use of the tool will greatly ease the Board's administrative burden and help ensure that absentee votes are accurately recorded.  Ex. 1, 97 *Op. Att'y Gen.* 32, 43 (2012). Accordingly, the balance of equities tips heavily in favor of granting Plaintiffs a preliminary injunction.

### IV.    An injunction is in the public interest.

Congress has made clear in enacting the ADA and Section 504 that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  *Lane*, 541 U.S. at 516 (quoting 42 U.S.C. § 12101 (b)(1)).  In the context of preliminary injunctions, courts have found that "[t]he public interest is clearly served by eliminating the discrimination Congress sought to prevent in passing

the ADA." *Jones v. City of Monroe*, 341 F.3d 474, 490 (6th Cir. 2003); *see Marlo M.* ex rel. *Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010) ("the public interest lies with upholding the law and having the mandates of the ADA and Rehabilitation Act enforced").

Furthermore, a preliminary injunction in this case would ensure that more citizens have the opportunity to cast their votes, thus promoting the fundamental right to vote.  *See, e.g.*, *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 796 (D. Md. 2008) *aff'd*, 368 F. App'x 370 (4th Cir. 2010) (finding that an injunction serves the public interest where it would "further[] the exercise and protection of [a] constitutional right").  Granting injunctive relief in this case promotes the right to vote, is consistent with the anti-discrimination mandate of the ADA and Section 504, and thus serves the public interest.

## V.    Plaintiffs are prepared to post a bond.

The Fourth Circuit has interpreted Federal Rule of Civil Procedure 65(c) to mean that "[a]lthough the district court has discretion to set the bond amount 'in such sum as the court deems proper,' it is not free to disregard the bond requirement altogether."  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).  "[I]n circumstances where the risk of harm is remote, a nominal bond may suffice."  *Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, No. CIV.A. DKC 13-1128, 2014 WL 857947, at *22 (D. Md. Mar. 4, 2014).  Plaintiffs are prepared to cover any costs and expenses incurred by the Board in making the online ballot marker tool available for the June 24, 2014 primary elections by posting a cash bond, pending final resolution on the merits, in the amount deemed proper by the Court.

**CONCLUSION**

The balance of the four factors for issuing a preliminary injunction weighs heavily in Plaintiffs' favor.  For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction and order the Board to make the online ballot marker tool available for use in the June 24, 2014 primary elections.

Respectfully submitted,


_____/s/_____
Daniel F. Goldstein, Fed. Bar No. 01036
Jessica P. Weber, Fed. Bar No. 17893
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
dfg@browngold.com
jweber@browngold.com

*Counsel for Plaintiffs*


Date: May 19, 2014