IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| NATIONAL FEDERATION<br>OF THE BLIND, INC., et al. | * | |
| Plaintiffs, | * | |
| | * | Civil Action No.: RDB-14-1631 |
| v. | * | |
| LINDA H. LAMONE, et al. | * | |
| Defendants. | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM OPINION

The focus of this case is an unassumingly-named piece of software—the "online ballot marking tool."  Maryland law allows absentee ballot voters to receive their ballots electronically, and the online ballot marking tool would allow voters to also mark their ballots electronically before printing them for submission.[1]  The State of Maryland has been developing this software for the past several years.  The Plaintiff National Federation of the Blind has participated in that development process, and the Maryland Board of Elections has solicited and implemented its feedback.  An earlier version of the tool was available to all voters during the 2012 primary election and to some overseas voters during the 2012 general election.  Those earlier uses of the tool appear to have been uneventful, and there has been no evidence of security breaches connected to that use.  Nevertheless, despite the successful use of this tool, it is presently not being made available for the 2014 general election.

---

[1] A more detailed description of the tool is contained in Subsection C of this Court's Findings of Fact.

In response to an opinion issued by the Maryland Attorney General's Office that the tool was not a "voting system," the Maryland General Assembly passed a statute in 2013 requiring that the tool be certified by the Maryland Board of Elections before it could be used in further elections. The current version of the tool now includes accessibility features for disabled voters thanks to the Board's work with Plaintiff National Federation of the Blind, and this new version is capable of implementation for the 2014 general election. However, the Board has not certified the tool and, therefore, the State does not plan to make the tool available to any voters for the upcoming election.

The Plaintiffs in this case[2] have sued Linda Lamone, the State Administrator of the Maryland State Board of Elections ("the Board"), and the individual members of the Board[3] for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101-12213, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;[4] specifically, Plaintiffs complain that they are unable to privately and independently participate in the State's absentee ballot voting program. Plaintiffs request that this Court order the Board to make the online ballot marking tool available to them in the upcoming 2014 Maryland general election.

---

[2] The Plaintiffs are the National Federation of the Blind, Kenneth Capone, Melissa Riccobono, and Janice Toothman.

[3] The Board members include Bobbie Mack (Chairman of the Board), David McManus (Vice Chairman of the Board), Patrick Hogan, Janet S. Owens, and Charles Thomann.

[4] All Defendants are sued in their official capacities.

Subsequently, a coalition of three individuals and three organizations (the "Putative Intervenors")[5] filed a Motion to Intervene in this action in order to assert their own claims against the Defendants and to essentially bar certification of the online ballot marking tool. After a conference call with the parties, this Court decided to permit the Putative Intervenors to participate in the case on a provisional basis and hold the motion *sub curia* for decision at a later date.

This Court held a three-day bench trial on August 13, 14, and 26, 2014 and has carefully considered the exhibits introduced into evidence, the testimony of the witnesses who testified in person, the written submissions of the parties, and the oral arguments of counsel.[6] For the reasons stated herein, the Putative Intervenors' Motion to Intervene (ECF No. 21) is GRANTED IN PART and DENIED IN PART; specifically, the motion is granted to the extent the Putative Intervenors have participated thus far, but it is denied to the extent that the Putative Intervenors attempt to assert independent claims against the Defendants.

The following also constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure with respect to the bench trial. This Court finds that Plaintiffs have been denied meaningful access to the State's

---

[5] The Putative Intervenors include Charles Crawford, Jane Sheehan, Cindy LaBon, the American Council of the Blind of Maryland, Verified Voting.org, and SAVEourVotes.org. For the sake of consistency, this Court will continue to use the term "Putative Intervenors," as has been done since the Motion to Intervene was filed.

[6] In advance of the trial and in accordance with this Court's Scheduling Order (ECF No. 13), Plaintiffs' filed a Motion for Permanent Injunction (ECF No. 26) and Defendants filed a Motion for Summary Judgment (ECF No. 28). Both motions are still pending on the docket, but in light of the fact that this Court has already conducted a bench trial, they are moot. Moreover, both motions would have required this Court to make factual determinations regarding the reasonableness of Plaintiffs' requested accommodation and, as such, pre-trial resolution would have been inappropriate. Nevertheless, this Court has reviewed the legal arguments made therein and has considered them as well.

absentee ballot voting program as mandated by the Americans with Disabilities Act and the Rehabilitation Act.  This Court also finds that allowing the Plaintiffs to use the online ballot marking tool is a reasonable and necessary modification to the State's program, and further finds that the use of such an aid in the 2014 general election would not constitute a fundamental alteration of that program and would not impose an undue financial or administrative burden.  Accordingly, the accompanying Order enters Judgment in favor of Plaintiffs with respect to Plaintiffs' claims and the Defendants are hereby ORDERED that it shall make the online ballot marking tool available to Plaintiffs for the 2014 general election.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Individual Plaintiffs Kenneth Capone, Melissa Riccobono, and Janice Toothman are Maryland voters with various disabilities.  Plaintiff Kenneth Capone has cerebral palsy and cannot use his arms or legs; Plaintiff Melissa Riccobono is blind; and Plaintiff Janice Toothman is blind and deaf.

Due to their disabilities, Individual Plaintiffs have difficulty voting without assistance. Plaintiffs also prefer to vote by absentee ballot and wish to do so in the upcoming Maryland general election.  Individuals who choose to vote by absentee ballot receive their ballots by mail or fax, or by downloading a ballot from the Board's website.  Regardless of the method of delivery, voters currently must mark their ballots by hand before submitting them. Although the State has developed a fully-functional online ballot marking tool, the Board has not certified the tool, which is a requirement of implementation under state law.  *See* Md. Code, Elec. Law § 9-308.1.

Plaintiffs filed the present action on May 19, 2014 after the Board failed to hold a vote to certify the online ballot marking tool at the Board's April 2014 meeting.  Specifically, Plaintiffs sued Linda Lamone, the State Administrator of the Maryland State Board of Elections ("the Board"), Bobbie Mack, the Chairman of the Board, David McManus, Vice Chairman of the Board, and Patrick Hogan, Janet S. Owens, and Charles Thomann, as members of the Board, for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101-12213, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The main thrust of their suit focuses on the State's absentee ballot procedures; Plaintiffs specifically seek to force the State to make the online ballot marking tool available to them for the 2014 general election.  When Plaintiffs initially filed this action, they also moved the Court for a preliminary injunction "prohibiting the Board from violating Title II of [the ADA] and Section 504 of the Rehabilitation Act of 1973 . . . and requiring the Board to make the online ballot marking tool available for the June 24, 2014 primary election and all future elections."  *See* Pls.' Mot. Prelim. Inj., ECF No. 3.  This Court held a hearing on June 11, 2014, and ultimately declined to order a preliminary injunction.  *See* Order, ECF No. 12. However, this Court scheduled a bench trial for August 13 and 14, 2014 so that, if Plaintiffs were to prevail, the State could still implement the online ballot marking tool before absentee ballots are sent out to voters on September 19, 2014.

On August 1, 2014, several individuals and three entities (the "Putative Intervenors") filed a Motion to Intervene (ECF No. 21).   The Putative Intervenors include Charles Crawford, Jane Sheehan, Cindy LaBon, the American Council of the Blind of Maryland,

Verified Voting.org, and SAVEourVotes.org.[7]  The Putative Intervenors also attached a proposed Complaint (ECF No. 21-2) to their Motion to Intervene in which they asserted several claims against the named Defendants, including a claim for violation of the ADA and Section 504 of the Rehabilitation Act (Count I); a 28 U.S.C § 1983 claim for violation of the Equal Protection Clause of the Fourteenth Amendment (Count II); a § 1983 claim for violation of the Substantive Due Process Clause of the Fourteenth Amendment (Count III); a § 1983 claim for violation of the Equal Protection Clause arising out of the state-created right to a secret ballot (Count IV); and a § 1983 claim for violation of the First Amendment Right to Freedom of Speech (Count V).

On August 8, 2014, this Court held a conference call with counsel for all parties, including the Putative Intervenors, in order to discuss the best way to proceed in light of the Motion to Intervene.  Ultimately, this Court, with the agreement of the parties, opted to hold the Motion to Intervene *sub curia* and to allow the Putative Intervenors to participate at the trial, which remained scheduled for August 13 and 14, 2014.[8]  This Court also issued a letter order (ECF No. 29) setting additional scheduling deadlines in order to allow all parties to participate under fair time constraints while also allowing the case to proceed on the

---

[7] Mr. Crawford, Ms. Sheehan, and Ms. LaBon are Maryland voters who are blind.  The American Council of the Blind of Maryland is the state-affiliate of the national organization the American Council of the Blind. The organization's goal is to increase the independence, security, equality of opportunity, and quality of life for all blind and visually-impaired people in the state.  VerifiedVoting.org is a nonprofit organization that advocates for legislation and regulation that promotes accuracy, transparency and verifiability of elections. SAVEourVotes.org is a statewide nonpartisan grassroots organization working for secure, accessible, and verifiable elections in Maryland.

[8] This Court notified the parties, however, that it would reserve August 26, 2014, in case an additional day was needed for the trial.  As it turned out, this third day was in fact necessary.

expedited schedule necessary for resolving these matters before the Maryland general election.

## II.   MOTION TO INTERVENE

As a preliminary matter, this Court will first resolve the pending Motion to Intervene (ECF No. 21), which this Court has held *sub curia* until this point.   Intervention is governed by Rule 24 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action:
> . . .
> (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
>
> (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action:
> (1) In General. On timely motion, the court may permit anyone to intervene who:
> . . .
> (B) has a claim or defense that shares with the main action a common question of law or fact.
> . . .
> (3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24.

As this Court suggested during the August 8, 2014 teleconference on the Motion to Intervene, Putative Intervenors have proceeded under a theory of permissive intervention pursuant to Rule 24(b).   A district court has broad discretion over determinations of permissive intervention.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351 n.4 (1983).

In general, "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (internal quotation marks omitted).

It should be noted at the outset, however, that the Putative Intervenors' position in this suit is somewhat atypical.  Unlike the normal case where the intervenor seeks to join the litigation on one side or another, the Putative Intervenors essentially argue that the Defendants have violated their rights in ways similar to the Plaintiffs, but they also attempt to assert independent claims against the Defendants and seek relief that is directly opposed to that sought by the Plaintiffs.[9]  For example, with respect to the Putative Intervenors' disability discrimination claim, the Putative Intervenors seek to show that the same legal conclusion as the Plaintiffs—that the Defendants have violated the ADA and Rehabilitation Act by preventing disabled individuals from participating in absentee ballot voting—but they desire to present evidence that the online ballot marking tool is not a reasonable modification under the ADA and Rehabilitation Act and they demand an injunction against any future certification and use of the online ballot marking tool.[10]

---

[9] As noted above, the Putative Intervenors have made the following claims: a claim for violation of the ADA and Section 504 of the Rehabilitation Act (Count I); a 28 U.S.C § 1983 claim for violation of the Equal Protection Clause of the Fourteenth Amendment (Count II); a § 1983 claim for violation of the Substantive Due Process Clause of the Fourteenth Amendment (Count III); a § 1983 claim for violation of the Equal Protection Clause arising out of the state-created right to a secret ballot (Count IV); and a § 1983 claim for violation of the First Amendment Right to Freedom of Speech (Count V).

[10] In essence, the Putative Intervenors have asserted that, while the State has excluded disabled voters from absentee ballot voting, certification of the online ballot marking tool would violated their rights because the tool is not accessible.  Specifically, the Putative Intervenors' ADA/Rehabilitation claim states:

> 101. Ms. LaBon, Mr. Crawford, Ms. Sheehan, and other ACBM members have a physical impairment that substantially limits one or more major life activities.
> 102. Ms. LaBon, Mr. Crawford, Ms. Sheehan, and other ACBM members are registered to vote in Maryland. They consequently are qualified to use absentee voting tools in Maryland's elections.

Turning first to the Putative Intervenors' § 1983 claims, the Court notes that permissive intervention on these counts would inject a variety of other legal issues into the case. In light of the condensed time-frame under which this case must proceed, expansion of the scope of this litigation is inappropriate as such expansion would merely delay this Court's decision in this pressing matter.[11]

The Putative Intervenors' claim under the ADA and Rehabilitation Act (Count I) presents a somewhat closer question because both the Plaintiffs' claims and the Putative Intervenors' Count I raise common issues of law and fact regarding the accessibility and security of the online ballot marking tool. However, the unusual posture of this case (noted above) presents this Court with two complex questions—one procedural, one substantive.

---

103. The proposed online voting tool is not accessible.
104. The proposed tool does not meet the requirements under Md. Code Ann., Elec. Law § 9-203: the ballots on the system are not easily understandable by blind voters, nor do the ballots allow blind voters to easily record their votes.
105. If the Board adopts the online ballot marking tool, Ms. LaBon, Mr. Crawford, Ms. Sheehan, and other ACBM members will be denied access to and use of the online ballot marking tool in a manner that is equal to that afforded others on the basis of their disability.
106. The Board intentionally discriminates against blind voters by being deliberately indifferent to the strong likelihood that a violation of federal rights will result from its actions and continuing to pursue certification of the proposed tool.
107. As a direct and proximate result of the continuing certification of the proposed tool by the Defendants, Intervenors will suffer deprivation of and irreparable harm to their rights under Title II of the ADA and Section 504 of the Rehabilitation Act of 1973. Intervenors have no adequate legal, administrative, or other remedy by which to prevent or minimize this harm. Unless Defendants are enjoined from certifying the proposed tool, Intervenors will suffer great and irreparable harm.

Putative Intervenors' Compl. ¶¶ 101-07.

[11] The issue of timeliness plays a factor in this Court's decision as well. Plaintiffs initially filed this action on May 19, 2014. After the preliminary injunction hearing on June 11, 2014, this Court scheduled the case for a bench trial on August 13 and 14, 2014. Despite awareness of the suit and the clear need for expeditious resolution, the Putative Intervenors did not file their motion until August 1, 2014. The Putative Intervenors claim that the reason for their delay is that they did not realize that their interests were inadequately represented by the State until the Board's July 10, 2014 meeting. However, this Court cannot ignore the fact that the motion was not filed until three weeks *after* that meeting and *less than* two weeks before the scheduled trial date (with only eight intervening business days).

The first is an issue of standing.[12]  Although standing is typically treated as a matter of subject matter jurisdiction, the issue in this case did not fully arise until the last day of trial. In their closing arguments and again in their Proposed Findings of Fact and Conclusions of Law, the Putative Intervenors for the first time argued that a demonstration of Article III standing is unnecessary for a party seeking permissive intervention under Rule 24(b).[13]  By a post-trial letter (ECF No. 57), Plaintiffs have argued that a showing of Article III standing is necessary where an intervenor attempts to assert an independent claim for relief.  After reviewing the parties' submissions and conducting its own research, this Court notes that the precise issue appears to be unresolved in the United States Court of Appeals for the Fourth Circuit.[14]

The second issue is whether a disabled individual may maintain a cause of action under the ADA and Rehabilitation Acts in order to *prevent* a particular accommodation from being implemented.  This issue, while alluded to by Plaintiffs at various times throughout the litigation, has not been extensively briefed or argued.

---

[12] Plaintiffs also challenge the ripeness of the Putative Intervenors' claim.

[13] Notably, Plaintiffs argued that the Putative Intervenors' lacked standing in both their Opposition to the Motion to Intervene (ECF No. 25) and in their opening statement.

[14] The Plaintiffs correctly noted that the Putative Intervenors' cited cases did not involve a situation where an intervenor attempts to assert independent claims.  *See Shaw v. Hunt*, 154 F.3d 161, 165 (4th Cir. 1998) (noting, in a case to determine whether intervenors were entitled to statutory attorneys' fees, that "a party who lacks standing can nonetheless take part in a case as a permissive intervenor" in a case where intervenors had joined lawsuit under same complaint as Plaintiffs); *NAACP v. Duplin Cnty.*, Civ. A. no. 7:88-5, 2012 WL 360018, at *3 n.3 (E.D.N.C. Feb 2, 2012) (refusing to require a showing of standing where party has demonstrated requirements of intervention as matter of right as a defendant).
     Moreover, there appears to be conflicting authority among the other Circuits.  *See U.S. v. Arch Coal, Inc.*, Civ. A. No. 2:11-0133, 2011 WL 2493072, at *7 n.4 (S.D. W. Va. June 22, 2011) (recognizing disagreement among Circuits and noting that *Shaw v. Hunt*, 154 F.3d 161 (4th Cir. 1998), does not include a "definitive analysis" of the standing issue).

As these complicated and nuanced issues were not raised by Plaintiffs' original claims, it is clear that permitting the Putative Intervenors to assert their own claims against the Defendants would significantly expand the scope of this litigation.  Moreover, this Court would be forced to address these issues with very limited argument from the parties and under pressing time constraints.  Accordingly, this Court finds that permitting the Putative Intervenors to proceed under a separate complaint would be inappropriate in this case.[15]

Nevertheless, this Court will permit the Putative Intervenors to intervene to the extent that they have already participated in this litigation.  The Putative Intervenors' presence has provided the Court with a fuller picture of the issues in this case, and this Court will consider the evidence and legal argument proffered by the Putative Intervenors in making its decision.  Indeed, the Court notes that this result is consistent with the Putative Intervenors' stated reason for intervening in the first place—"to present the Court with evidence concerning the significant security and privacy risks of the online ballot marking tool as well as evidence of its inaccessibility to blind voters."  Mem. Supp. Mot. Intervene 6, ECF No. 21-1.  Accordingly, this Court will grant the Motion to Intervene in part, allowing the Putative Intervenors to participate in this litigation to the extent they have thus far, while denying the Motion to the extent that the Putative Intervenors' attempt to assert independent claims against the Defendants.

## III.   FINDINGS OF FACT

### A.  Maryland's Current Voting Program

---

[15] Despite the fact that this Court will permit intervention, at least in part, this Court will continue to refer to those parties as the "Putative Intervenors" for the sake of consistency, as noted above.

Maryland offers its voters a wide variety of choices in voting.  Voters may vote on Election Day at their designated polling place.  Of the 1900 polling places in Maryland, 1888 are accessible to physically disabled voters on Election Day.  Election judges are also trained in serving voters with disabilities.  The voting machines that voters use to cast their ballots are compliant with state and federal law, including the Help America Vote Act.[16]  These machines allow voters to magnify the font of the ballot, alter the color contrast, and position the screen at a ninety-degree angle to allow a voter to sit while casting his or her ballot.  Moreover, the voting machines can be programmed, at the voter's request, for non-visual access by means of an audio ballot; in such a situation, the voter receives a headset and numeric key pad to make his or her selections and to move around the ballot.[17]  Voters requiring assistance in marking the ballot also have the right to choose an individual to provide assistance or to be assisted by an election judge in the presence of a second election judge of another political party.  At this time, however, the voting machines do not work with refreshable Braille displays.

In addition, Maryland allows for early in-person voting at sixty-four locations around the State for an eight-day period; all of those sixty-four locations are physically accessible.

Finally, any Maryland voter may vote by absentee ballot—a program referred to as "no excuse" absentee ballot voting.  If a voter chooses to vote by absentee ballot, the voter may receive the ballot by mail, fax, or online electronic delivery.  Under the current system, if a voter receives a ballot by online electronic delivery, the voter must then print out the ballot

---

[16] The Help America Vote Act of 2002, Pub. L. 107-252, 42 U.S.C. § 15301 *et seq.*, mandated sweeping reforms to the way elections were conducted and included a requirement for accessible voting systems.

[17] There were no complaints reported to the State Board concerning lack of accessible voting equipment required under state law in connection to the 2014 primary election.

and mark it by hand.  In order to have the ballot counted, the voter must then sign the ballot and return it to the voter's local board of election.  Absentee voters may designated an agent to pick up, deliver, and/or return their absentee ballots, and they may also complete a certification of assistance in order have an individual (chosen by the voter) assist them in marking their absentee ballots.

### B.  Voting Difficulties for Plaintiffs

As noted above, Mr. Capone has cerebral palsy and cannot control his hand or arms and cannot use his voice to speak.  Mr. Capone wears a head stick that allows him to operate a computer.

Plaintiff Melissa Riccobono is blind and uses screen reader software or a refreshable Braille display to interact with computers.  She has found Maryland poll workers poorly trained in operating the accessibility features of voting machines.

Plaintiff Janice Toothman is blind and has difficulty hearing unless the audio source is within a few feet and there is little background noise.  Ms. Toothman has also found Maryland poll workers to be poorly trained and, moreover, has difficulty using the voting machine's audio output accessibility feature due to her hearing issues.

At the trial, the evidence demonstrated specific difficulties that some disabled voters have experienced while voting.  Putative Intervenor Cindy LaBon testified that she waited an hour and a half when she voted in-person in 2010 before she was able to use a voting machine with non-visual access.  Similarly, Plaintiff Ms. Toothman testified that she experienced delays when she requested a voting machine with non-visual access, and she further testified that, even once the voting machine was properly configured, she had great

difficulty in making her selections because her limited hearing did not allow her to clearly hear the audio prompts from the voting machine.  Moreover, the testimony at trial revealed that, under the current absentee ballot voting program, individuals with disabilities such as those of the Plaintiffs cannot vote privately and independently.

## C.  Development of the Online Ballot Marking Tool and the Board's Certification Efforts

For the past several years, the State of Maryland has been developing a software tool (the "online ballot marking tool") that allows absentee voters who receive their ballots electronically to mark their ballots before printing them out for submission.  After voters mark their ballots using the tool, voters are presented with a review screen that allows voters to check to make sure their selections are accurate.  After reviewing their selections, voters may print their ballot.  In order to produce the printed ballot, the voter's computer sends a signal with the voter's selections to the Board's server, which then produces a marked ballot in PDF format for printing by the voter.[18]  When the ballot is printed out, the voters' selections appear on a number of pages while the signature page prints on a separate page. Only printed and signed ballots that are received by a local board of election are counted.

Plaintiff National Federation of the Blind participated in the development of this tool and, as explained below, the Board solicited and implemented significant feedback on the tool's usability and accessibility for disabled voters.  Notably, the tool is not compatible with all types of browsers or operating systems, but the tool functions properly with a variety of reasonably up-to-date products.

---

[18] Ms. Nicole Charlson testified to the process by which marked ballots are produced for voters who choose to use the online ballot marking tool.  Prior to her testimony, other witnesses had offered their thoughts on how that process worked, but those witnesses had not reviewed the actual code for the tool.

A non-accessible, earlier version of the tool was available to absentee ballot voters during the 2012 primary election.  In the aftermath of the primary election, the Maryland Attorney General's Office issued an opinion letter in August 2012 stating that the online ballot marking tool was not a "voting system" requiring certification pursuant to section 9-102 of the Election Law Article of the Maryland Code.  However, concerns were expressed by some about the legality of the tool under Maryland law, and the Board only made the tool available to voters covered by the Overseas Civilian Absentee Voting Act of 1986 for the 2012 general election.

Despite the successful use of the tool during the 2012 elections, the Maryland General Assembly passed the Improving Access to Voting Act, Senate Bill 279 & House Bill 224, 2013 Legis. Sess., during the 2013 legislative session.  The Act, codified at § 9-308.1 of the Election Law Article of the Maryland Code, required the Board to certify the online ballot marking tool before making it available to absentee voters.[19]  Under that statute,

---

[19] The Act has been codified at Md. Code, Elec. Law § 9-308.1, which states that:

> (1) Except as provided in paragraph (2) of this subsection, the State Board shall certify that an online ballot marking tool satisfies all of the certification requirements under § 9-102(d) of this title before approving an online ballot marking tool for use by voters.
> (2) An online ballot marking tool is not required to satisfy the requirements of:
>> (i) § 9-102(d)(2) of this title if the U.S. Election Assistance Commission has not approved specific performance and test standards for online ballot marking tools; or
>> (ii) § 9-102(d)(1)(iii) of this title.

Md. Code, Elec. Law § 9-308.1.

Thus, in order to certify the tool, the Board must determine that the tool satisfies the following requirements of § 9-102:

> (1) the voting systems will
>> (i) protect the secrecy of the ballot;
>> (ii) protect the security of the voting process;
>> . . .
>> (iv) accommodate any ballot used under this article;
>> (v) protect all other rights of voters and candidates;
>> (vi) be capable of creating a paper record of all votes cast in order that an audit trail is available in the event of a recount, including a manual recount; and
>> (vii) provide a voter-verifiable paper record that:

certification requires a supermajority vote by the Board—meaning four of the five Board members must vote in favor.

During its February 2014 meeting, the Board took up the issue of the online ballot marking tool. At that meeting, the Board reviewed a December 2013 report compiled by Unatek, Inc. that analyzed the State's online voting services including the online ballot marking tool. The Board also interviewed the author of the report. Although the report concluded that the tool was secure, some of the Board members expressed concerns about security issues and found the Unatek report to be unconvincing. The Board therefore asked for more information about the tool to aid in their decision-making process.

Following the February meeting, the Board's staff engaged Mainstay Enterprises to independently audit the December 2013 Unatek report. The audit concluded that the December 2013 Unatek report author was qualified and that his procedures followed the industry best practices.[20] The Board also received letters and/or comments on the issue of the tool's security from various parties. Additionally, the Board's staff compiled a survey reporting on the use of electronic ballot marking tools by other states. Although the survey did not include information on every state, only Alaska and Delaware were identified as states that were making an online ballot marking tool available for voters with disabilities in

---

1. is an individual document that is physically separated from any other similar document and not part of a continuous roll;
2. is sufficiently durable to withstand repeated handling for the purposes of mandatory random audits and recounts; and
3. uses ink that does not fade, smear, or otherwise degrade and obscure or obliterate the paper record over time;

* * *

(3) the public interest will be served by the certification of the [online ballot marking tool].
Md. Code, Elec. Law § 9-102(d).

Notably, the Act also expressly authorized internet delivery of absentee ballots.

[20] The author of the audit attended the Board's April meeting and was interviewed by the Board members.

the 2014 election.  However, a number of states provide an electronic ballot marking tool that is available to some overseas voters.

The certification issue was again raised at the Board's April 2014 meeting.  During the meeting, the Board reviewed the results of the audit report.  At least two members of the Board expressed an interest in additional testing and were unwilling to approve the tool. Accordingly, the Board did not take a vote on certification at that time.

After the initiation of this suit, the Board met again on July 10, 2014.  Defendant Board member Charles Thomann was absent at that meeting.  The Board held a formal vote to certify the online ballot marking tool, and all but one member voted to certify.  Although the vote was 3-1 in favor, certification failed because there was not a supermajority (i.e., 4) of votes in favor.[21]

### D. Assessment of the Accessibility of the Online Ballot Marking Tool

Dr. Kathryn Summers of the University of Baltimore conducted a usability study of the online ballot marking tool during the tool's developmental phase.   Dr. Summers conducted two rounds of iterative testing.  The users in the study included individuals with low vision or no vision, seniors, and individuals with mobility, dexterity, hearing, or mild cognitive issues.  The first round of testing was conducted in October 2013 and used a limited number of different accessibility softwares.  The first round of testing revealed a number of accessibility issues, including issues with the labelling of buttons and the review screen.   The second round of testing, conducted in November 2013, was performed remotely, and the technology environment was not controlled (meaning individuals could

---

[21] According to the record in this case, the Board has not taken any action since that July 2014 meeting.

use their own software).  In this second round of testing, all users were successfully able to use the tool to mark their ballots privately and independently.

Dr. Summers testified that the issues identified during the two phases of her usability study were resolved by the end of the testing.  She also testified that the online ballot marking tool was highly accessible for disabled voters, although she acknowledged that there was still room for improvement, particularly with respect to the printing, signing, and mailing of ballots.

In addition to Dr. Summers' testing, the tool was made available for two public demonstrations.  Mr. Charles Crawford, one of the Putative Intervenors, and Mr. Noel Runyan testified that they had difficult accessing the ballot and using the tool during these public demonstrations.

At trial, Plaintiffs' computer information systems expert Anne Taylor provided a demonstration of the online ballot marking tool.  The tool is compatible with reasonably up-to-date computer and screen access software, and Ms. Taylor opined that the tool is accessible to blind individuals with such software.  The tool is designed in accordance with the Web Content Accessibility Guidelines.  Additionally, the tool is compatible with refreshable Braille displays.

The testimony at trial revealed that there are some other challenges to private and independent voting by absentee ballot for disabled voters even when using the tool.  For example, disabled voters may need assistance in signing their ballots before submission.  However, the testimony at trial also indicated that, because the signature sheet prints on a separate page, the risk of disclosure of a disabled voter's selections was minimized and, in

any event, was significantly less than that afforded under the current paper absentee ballot system, which requires a disabled voter to communicate his or her selections to a third party who would then mark those selections for the voter on the ballot.

### E. Assessment of the Security Risks Posed by the Online Ballot Marking Tool

During the trial, the Plaintiffs called Mr. Juan Gilbert as an expert on secure voting systems.   Juan Gilbert testified that the online ballot marking tool exhibited software independence, meaning that a change to the voting software used for an election cannot cause an undetectable change to the outcome of an election.   Mr. Gilbert also testified that there were no additional risks that did not exist in other methods already available to Maryland voters.

The evidence also demonstrated that a marking tool that was compatible with all browsers or operating systems, regardless of age, would present security risks.   Systems that are no longer supported by the programmer/supplier are no longer updated to patch security vulnerabilities, and Mr. Gilbert testified that these vulnerabilities could undermine the security of the tool's operation.

The online ballot marking tool, however, is not without some security risks.   As noted above, a voter makes his or her selections on his computer, but the actual printable ballot is generated by the Board's server after the voters' computer transmits the voters' selections to the Board's server.   The voter's selections, however, are not stored on the Board's server.   Thus, a voter's privacy could be invaded by a third party if the voter's computer is infected with some form of malware or spyware; essentially, the malware could enable the third party to observe a voter's selections.   Dr. Gilbert testified that these risks

could be eliminated by marking and printing multiple ballots, using a different machine, or using a computer at a public library.   These strategies, however, are not currently communicated to voters by the instructions for the online ballot marking tool.

In addition, the evidence also demonstrated that there may be some risk that a voter's selections could be captured if a third party infiltrated the Board's server during the time a voter's selections and/or the printable ballot were being transmitted.

There was no evidence at trial that the online ballot marking tool had been tested against intentional attempts to infiltrate or hack into the Board's server or the tool

## IV.   CONCLUSIONS OF LAW

Both Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act prohibit discrimination against people with disabilities.  Title II of the ADA states that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.  Because the language of Title II of the ADA and Section 504 is substantially similar, the United States Court of Appeals for the Fourth Circuit analyzes the two statutes together. *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336, n.1 (4th Cir. 2012).  To prove a violation of either the ADA or Section 504, plaintiffs must establish that: (1) they have disabilities; (2)

they are "otherwise qualified to receive the benefits of a public service, program, or activity";

and (3) they were "excluded from participation in or denied the benefits of such service,

program, or activity, or otherwise discriminated against, on the basis of [their] disabilit[ies]."

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).[22]

Only the third element is in dispute in this case.  In assessing this third element of a

disability discrimination claim, there are "three distinct grounds for relief: (1) intentional

discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable

accommodations." *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008).  As

explained by Judge Chasanow in *Adams v. Montgomery College (Rockville)*, 834 F. Supp. 2d 386,

393 (D. Md. 2011):

> The requirement that a public institution make reasonable
> accommodations for disabled individuals finds support in the
> implementing regulations of Title II, which provide that "[a]
> public entity shall make reasonable modifications in policies,
> practices, or procedures when the modifications are necessary
> to avoid discrimination on the basis of disability, unless the
> public entity can demonstrate that making the modifications
> would fundamentally alter the nature of the service, program, or
> activity." 28 C.F.R. § 35.130(b)(7). Based on this provision, the
> Fourth Circuit has held that Title II of the ADA and the
> Rehabilitation Act require public entities to make reasonable
> accommodations for persons with disabilities. *See Helping Hand*,
> 515 F.3d at 362; *Waller ex rel. Estate of Hunt v. City of Danville*, 556
> F.3d 171, 174–75 (4th Cir.2009); *Constantine*, 411 F.3d at 488.

*Id.*; *see also Constantine*, 411 F.3d at 488 ("Title II imposes an affirmative obligation to make

'reasonable modifications to rules, policies, or practices, the removal of architectural,

communication, or transportation barriers, or the provision of auxiliary aids and services' to

---

[22] In addition, to prove a violation of Section 504, Plaintiffs must show that the Board receives federal funds.
*See* 29 U.S.C. § 794(a).  This element is not in dispute in this case.

enable disabled persons to receive services or participate in programs or activities." (quoting 42 U.S.C. § 12131(2))); 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

This suit presents three main issues for the Court's consideration: (1) whether Plaintiffs have meaningful access to the Maryland voting program and/or absentee voting; (2) whether the online ballot marking tool is a facially reasonable modification; and (3) whether the relief sought by Plaintiffs constitutes a fundamental alteration to the State's voting program.

## A. Meaningful Access

The relevant ADA regulations state that, when public entities provide aids, benefits, or services, they may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may they provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. 28 C.F.R. § 35.130(b)(1)(ii)-(iii); *see* 45 C.F.R. § 84.4(b)(1)(ii)-(iii) (substantially similar Section 504 regulation); *see also Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 189, 198 (2d. Cir. 2014) ("Plaintiffs need not, however, prove that they have been disenfranchised or otherwise completely prevented from enjoying a service, program, or activity to establish discrimination under Section 504 or Title II."

(internal quotation marks omitted)). Furthermore, the ADA regulations require that public entities provide "appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). The auxiliary aids and services must be provided "in a timely manner, and in such a way to protect the privacy and independence of the individual with a disability." § 35.160(b)(2); *see also Disabled in Action*, 752 F.3d at 199 (holding that the opportunity to participate in a voting program "includes the option to cast a private ballot on election days").

Throughout this litigation, the parties have disputed precisely how to define the scope of the service or program (i.e., the voting system) at issue in this case.  The Plaintiffs argue that the appropriate scope is absentee ballot voting; the Defendants, however, assert that this Court should assess Maryland's voting program as whole, which would encompass both absentee and in-person voting.  After reviewing the parties' arguments and support on this point, this Court finds that the appropriate scope of inquiry is absentee ballot voting. Significantly, Maryland allows *any* voter to vote by absentee ballot.  In this sense, absentee ballot voting is not a service provided only to those who require it; instead, it is a service that the State has opted to extend to *all* Maryland citizens.  Now that the State has created a benefit for all citizens, this Court must consider whether disabled citizens are provided equal access to that precise benefit.  Indeed, any other conclusion "would render meaningless the mandate that public entities may not afford persons with disabilities services that are not

equal to that afforded others." *Disabled in Action*, 752 F.3d at 199 (internal quotation marks and other marks omitted).[23]

Defendants have also argued throughout this litigation that Plaintiffs have not been denied meaningful access because Plaintiffs have no right to vote by absentee ballot *without assistance. See, e.g.,* Defs.' Mem. Supp. Mot. Summ. J. 22.   In support of this proposition, Defendants cite to *Taylor v. Onorato*, 428 F. Supp. 2d 384, 388 (W. D. Pa. 2006); *American Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1126 (C.D. Cal. 2004); *Nelson v. Miller*, 950 F. Supp. 205 (W.D. Mich. 1996), *aff'd on other grounds*, 170 F.3d 641 (6th. Cir. 1999).   In opposition, Plaintiffs have argued that courts now generally recognize that a denial of private and independent voting constitutes a denial of meaningful access.   *See* Pls.' Hr'g Br & Mem. Supp. Mot. Permanent Inj. 7-8 (citing *Disabled in Action*, 752 F.3d at 199; *California Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013); *Kerrigan v. Philadelphia Bd. of Election*, No. Civ. A. 07-687, 2008 WL 3562521 at *18 (E.D. Pa. Aug. 14, 2008); *Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004); *Nat'l Org. on Disability v. Tartaglione*, No. Civ. A. 01-1923, 2001 WL 1231717, at *3-4 (E.D. Pa. Oct. 11, 2001)).

---

[23] In addition, this Court finds the reasoning of *Kerrigan v. Philadelphia Bd. of Election*, No. Civ. A. 07-687, 2008 WL 3562521 (E.D. Pa. Aug. 14, 2008), to be instructive on this point.   In *Kerrigan*, voters with mobility disabilities sued because they could not vote at their neighborhood polling places.   The court recognized that the plaintiffs' rights included "the opportunity to vote in one's local, assigned, polling place" because of the special characteristics or advantages that came with that opportunity, such as "the opportunit[y] [for voters] to meet election judges, see their neighbors, and obtain information from candidates' representatives." *Kerrigan*, 2008 WL 3562521, at *17.   Similarly, in this case, there are special advantages associated with voting by absentee ballot. Absentee ballots provide voters with increased flexibility and convenience, and they also allow voters to avoid physically transporting themselves to a polling place—an aspect of in-person voting that is difficult for some disabled voters, such as Mr. Capone for example.

Notably, all of Defendants' cited cases pre-date recent revisions to the Department of Justice's ADA regulations. Of particular relevance in this case is 28 C.F.R. § 35.160(b)(2), which was amended in 2010 and made effective in 2011. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, Final Rule, 75 F. Reg. 56177, Sept. 15, 2010. As a result, § 35.160(b)(2) now states that "auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." In light of this addition, this Court finds the Defendants' authority is of limited relevance.

Moreover, recognition of a right to vote independently and privately comports with the basic purpose of the Rehabilitation Act. As the United States Court of Appeals for the Second Circuit explained in *Disabled in Action*, 752 F.3d at 200:

> Although [plaintiffs] were ultimately able to cast their vote with the fortuitous assistance of others, the purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society." 29 U.S.C. § 701(b)(1) (emphasis added). Indeed, as we have noted, "[i]t is not enough to open the door for the handicapped ...; a ramp must be built so that the door can be reached." *Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d. Cir.1982) (internal quotation marks omitted). The right to vote should not be contingent on the happenstance that others are available to help. [The Board of Elections'] services were not "readily accessible" to [plaintiffs], and, moreover, [one plaintiff] was deterred from appearing at her poll site in subsequent elections.

*Id.* In this case, it is clear that most voters may mark their absentee ballots without assistance. Plaintiffs should be afforded the same opportunity, but the State's current voting program does not allow for it. Accordingly, Plaintiffs have established that they are denied meaningful access to Maryland's voting program. *Cf. California Council of the Blind*, 985 F.

Supp. 2d at 1239 ("However, requiring blind and visually impaired individuals to vote with the assistance of a third party, if they are to vote at all, at best provides these individuals with an inferior voting experience 'not equal to that afforded others.' 28 C.F.R. § 35.130(b)(1)(ii). Blind and visually impaired voters are forced to reveal a political opinion that others are not required to disclose.").

### B.  Reasonable Modification

Even if a disabled individual is denied meaningful access to a particular service or program, the disabled individual must also propose a reasonable modification or accommodation in order to state a *prima facie* case for disability discrimination. *See Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d. 772, 789 (D. Md. 2001) (holding that a plaintiff must first prove that a modification or accommodation is reasonable and necessary before the fundamental alteration defense is addressed). In general, the reasonableness of a proposed accommodation or modification is a fact-intensive inquiry. *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d. Cir. 1995). The effectiveness of the accommodation is one factor to be considered. *Id.*

The reasonableness of the modification proposed by Plaintiffs in this case—i.e., the implementation of the online ballot marking tool for disabled voters—depends on (1) whether the tool is, in fact, accessible to disabled voters; and (2) whether the tool is sufficiently secure to prevent election tampering while also safeguarding voters' privacy as to their votes. The evidence adduced at trial indicated that the online ballot marking tool is

reasonably accessible to disabled individuals with access to reasonably up-to-date software.[24] While disabled voters may need some assistance during the process of using the online ballot marking tool, the actual marking of the ballot—and therefore the selections made by a disabled voter—can be kept private; therefore, the main interest protected by the right to vote privately and independently is served.   Moreover, the tool exhibits software independence, and the risks to voters' privacy are not overwhelming and are capable of mitigation.[25]   Accordingly, this Court finds that, although not perfect, the online ballot marking tool is a reasonable accommodation.[26]

The State's argument concerning the effect of § 9-308.1's certification requirement does not alter this Court's conclusion as to the reasonableness of the modification because that argument glosses over an important fact of this case.[27]   A version of the tool was available in the 2012 election without any apparent incident, which speaks to the reasonableness of the accommodation—the Maryland Assembly's after-the-fact creation of

---

[24] At trial, Putative Intervenors LaBon and Crawford indicated their desire for a tool that allows *all* disabled voters to participate in the absentee ballot voting procedures.  While the Court agrees that it would be preferable for all individuals be able to participate, the law only requires reasonable modifications.  Putative Intervenors' have not proffered any evidence to suggest that a tool capable of use by all disabled voters, regardless of computer access or familiarity, exists or is even feasible.  Moreover, the evidence at trial illustrated that a tool compatible with all types of software (such as out-of-date or unsupported software) would present security risks because software is no longer patched for newly-discovered vulnerabilities after the programmer stops supporting it.

[25] Putative Intervenors have suggested that a tool that resides purely on a user's computer, rather than operating over the internet, would be more secure.  However, the evidence shows that such a tool would have many of the same risks as the version of the online ballot marking tool that is currently available.

[26] Despite this Court's conclusion in this respect, the Court notes that the tool could perhaps be improved by informing voters of these risks and methods of mitigation.
  In addition, the Court notes that there is no need for the Court to resolve Plaintiffs' argument that the evidence proffered by the Putative Intervenors should not be considered by this Court in making its determination of the reasonableness of the Plaintiffs' proposed modification.  As the foregoing discussion indicates, the Court has considered that evidence and does not find it persuasive.

[27] The State also raised § 9-308.1 with respect to its "fundamental alteration" defense, which is discussed *infra*.

the certification requirement for the online ballot marking tool notwithstanding. While perhaps the analysis would be different if Plaintiffs sought to gain access to an uncertified tool that had never been used in a real-world situation, those are not the precise facts of this case.

## C. Fundamental Alteration

In light of the fact that Plaintiffs have established a *prima facie* case of disability discrimination under the ADA and Rehabilitation Act, the Defendants must prove that providing such aids would constitute a fundamental alteration of its voting program or impose an undue financial or administrative burden. *See* 28 C.F.R. § 35.164; *Disabled in Action*, 752 F.3d at 202. The relevant inquiry in this case focuses on a "fundamental alternation" because the online ballot marking tool has already been developed and the State has indicated that it is capable of implementation in time for the 2014 general election. Essentially, the Defendants must demonstrate that the proposed accommodation—the use of the online ballot marking tool by the Plaintiffs—would, in practice, "be unreasonable to implement." *Disabled in Action*, 752 F.3d at 202.

The parties' arguments on this point, once again, boil down to a disagreement on the proper scope of inquiry—in this situation, the precise program subject to alteration by the modification proposed in this lawsuit. Plaintiffs characterize their suit as an attempt to alter Maryland's absentee ballot voting program by forcing the state to implement the online ballot marking tool. The Defendants, however, argue that the modification affects the Maryland statute requiring certification of the online ballot marking tool. Citing to *Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003), Defendants have asserted that "eliminat[ion] [of]

28

a rule under the exact circumstances for which it was created" constitutes, "by definition, a fundamental alteration." Defs.' Mem. Supp. Mot. Summ. J. 36 (citing *Jones*, 341 F.3d at 480); *see also* Defs.' Proposed Findings of Fact & Conclusions of Law 10, ECF No. 51 ("Courts reject ADA claims where the proposed remedy involves a waiver of a reasonable, nondiscriminatory rule if such a waiver undermines or 'is at odds' with the purpose of the rule." (quoting *Jones*, 341 F.3d at 480)).

This Court does not read *Jones* as establishing a bright line rule. A fundamental alteration may or may not occur where the proposed modification is waiver of a state rule and where such waiver "undermines" or is "at odds" with the purpose of the rule. As the language of the *Jones* decision indicates, it is not the mere existence of a contradiction of purpose, but the nature and severity of such a contradiction that matters. *See* 341 F.3d at 480) ("In cases involving waiver of applicable rules and regulations, the *overall focus* should be on whether waiver of the rule in the particular case would be *so* at odds with the purposes behind the rule that it would be a *fundamental and unreasonable* change." (emphasis added; internal quotation marks omitted)). The Defendants' reading of *Jones* also conflicts with authority from other Circuits that holds that the ADA may preempt state statutes or require waiver of certain state requirements under some conditions. *See Mary Jo C. v. N.Y. State and Local Retirement Sys.*, 707 F.3d 144, 163 (2d. Cir. 2013) ("[T]he ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of inconsistent state laws, when necessary to effectuate Title II's reasonable modification provision.").

Nor does this Court find *Jones* to be analogous as a factual matter.  The plaintiff in *Jones* was a disabled woman who wanted to make use of free parking by her workplace.  However, the parking spots near her work had a one-hour time limit, while free all-day parking was located several blocks away.  The plaintiff sought waiver of the one-hour limit.  While the Sixth Circuit noted that waiver of the one-hour limit would destroy the purpose of the rule (making parking readily available for shop and business customers in the area), it also noted that the plaintiff could make use of a free city-provided service that would have shuttled her from the free parking to her place of work.  Therefore, the case is distinguishable: in *Jones*, the free all-day parking was readily accessible to the plaintiff in the same way as it was to non-disabled individuals as a matter of fact; here, however, the Plaintiffs have shown that they are unable to participate in the absentee voting program in the same way that non-disabled voters are—i.e., in a way that protects their privacy and independence.

Moreover, waiver of the certification requirement for those disabled voters requiring the tool to vote privately and independently does not constituted a *fundamental* alteration to the State's absentee ballot voting program.  Indeed, Plaintiffs have not requested—nor will this Court order—that the online ballot marking tool be made available to *all* voters.

## V.   <u>REMEDIES</u>

In their Amended Complaint, Plaintiffs requested the following relief;

> a.  A preliminary and permanent injunction prohibiting Defendants from violating the ADA and Section 504 and requiring the Board to make the online ballot marking tool available for the November 2014 general election and all future elections;

    b.  A declaration that Defendants have and continue to violate the ADA and Section 504;

    c.  An award of compensatory damages to Ms. Toothman;

    d.  An award of Plaintiffs Mr. Capone, Ms. Riccobono, Ms. Toothman, and the NFB's reasonable attorneys' fees and costs; and

    e.  Such other and further relief as the Court may deem just.

Pls.' Am. Compl. 17-18, ECF No. 18.

By agreement of counsel, the compensatory damages issue is not currently before the Court. Thus, the main question for this Court to resolve is the extent to which Plaintiffs are entitled to declarative and injunctive relief.[28]

As noted above, this Court finds that the Defendants have and continue to violate the ADA and Section 504 of the Rehabilitation Act by denying Plaintiffs the right to vote by absentee ballot in a private and independent manner. Accordingly, Plaintiffs are entitled to a declaratory judgment to that effect.

A party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

As noted above, Plaintiffs are entitled to judgment on their claims. With respect to irreparable harm, the Plaintiffs have adequately shown that they will be deprived of equal

---

[28] This Court does not address the Plaintiffs' demand for attorneys' fees at this time.

access to the right to use an absentee ballot in the 2014 Maryland general election if they are not afforded access to the online ballot marking tool.   Moreover, Plaintiffs are being deprived of their right to vote by absentee ballot privately and independently, and the end of that deprivation is nowhere in sight.   Remedies available at law are inadequate to compensate for violation of an individual's civil rights or civil liberties.   *See Legend Night Club v. Miller*, 637 F.3d at 302.   Accordingly, Plaintiffs' remedies available at law are inadequate.   The Plaintiffs have also demonstrated that the balance of the equities tips in their favor.   The tool is available and capable of implementation at this time.   Finally, the Plaintiffs have demonstrated that an injunction would be in the public interest.   An injunction would assure that people with disabilities can vote privately and independently by absentee ballot.   While the State has raised the issue of compliance with its own laws and procedures, such compliance cannot trump the federal dictates of the ADA and the Rehabilitation Act under the facts as they are presented here.   As Plaintiffs have met all four requirements, this Court will issue a permanent injunction that (1) prohibits Defendants' from further violating Plaintiffs' rights under the ADA and Rehabilitation Act in the upcoming 2014 general election and in all future elections; and (2) requires Defendants to make the online ballot marking tool available to Plaintiffs for the 2014 general election.

However, while Plaintiffs have requested that this court make the online ballot marking tool available for "all future elections," this Court declines to do so.   Further developments of the tool or new and more effective technologies could render the current tool obsolete and make further use unreasonable.   The relief, as fashioned by the Court, allows Plaintiffs to participate in the upcoming election while still preserving the State's

choice in how to make absentee ballot voting accessible to individuals with disabilities in the future.

## VI.   CONCLUSION

For the reasons stated above, Putative Intervenors' Motion to Intervene (ECF No. 21) is GRANTED IN PART and DENIED IN PART; specifically, the motion is granted to the extent the Putative Intervenors have participated thus far, but it is denied to the extent that the Putative Intervenors' attempt to assert independent claims against the Defendants.

Furthermore, by separate order, JUDGMENT will be ENTERED in favor of Plaintiffs National Federation of the Blind, Kenneth Capone, Melissa Riccobono, and Janice Toothman against Defendants Linda Lamone, the State Administrator of the Maryland State Board of Elections ("the Board"), Bobbie Mack, Chairman of the Board, David McManus, Vice Chairman of the Board, Patrick Hogan, Janet S. Owens, and Charles Thomann with respect to Plaintiffs' claims.   Defendants will be PERMANENTLY ENJOINED from violating the Plaintiffs' rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation in the upcoming 2014 general election and in all future elections, and Defendants will be ORDERED to make the online ballot marking tool available to Plaintiffs for the 2014 general election.

A separate Order and Judgment follows.


Dated: September 4, 2014                    _____/s/_____
                                            Richard D. Bennett
                                            United States District Judge